**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In the Matter of the Extradition of | ) | |
| | ) | Misc. No. 24-160 |
| Nomalanga Moroadi Selina Cholota | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO
REQUEST FOR RELEASE PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations and acting at the request of the Government of the Republic of South Africa, respectfully requests that the fugitive in this case, Nomalanga Moroadi Selina Cholota ("Cholota"), be held without bond pending the hearing on the certification of her extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Cholota should be detained. In short, Cholota should be detained because she cannot overcome the strong presumption against bail in international extradition cases. Specifically, she cannot meet her burden of showing that she is not a flight risk, not a danger to the community, or that special circumstances warrant her release.

## I.  FACTUAL BACKGROUND

Authorities in South Africa seek Cholota's extradition so that she may be prosecuted for four (4) counts (Counts 3, 4, 5, 6) of Fraud contrary to its common law, and five (5) counts (Counts 15, 16, 17, 18, 19) of Corruption contrary to Section 3(a)(ii) and/or (iii) and/or (iv), or in the alternative Section (4)(1)(a)(i) and/or (ii) and/or (iii), of the South African Prevention and Combating of Corrupt Activities Act 12 of 2004, in relation to Sections 1, 2, 20, 24, 25, and 26 of the South African Prevention of Organised Crime Act 121 of 1998. A warrant for Cholota's arrest was issued on October 7, 2021, by the Magistrate of the Peace in Bloemfontein, Free State Province, South Africa. An amended warrant was issued on August 11, 2023, by the Magistrate

of the Peace in Bloemfontein, Free State Province, South Africa.  South Africa presents the following facts as the basis for its charges and arrest warrant:

Cholota, a South African citizen, is one of eighteen co-defendants accused of engaging in fraud, corruption, and money laundering in connection with the procurement of monetary kickbacks related to an illicit contract to eradicate asbestos within Free State province in South Africa.  One of the co-defendants is the then-Premier of Free State, for whom Cholota served as personal assistant during the relevant time period.  According to the extradition request, Cholota's duties went beyond that of a typical personal assistant and involved "personal matters" of the Premier.  As set forth in more detail below, Cholota is accused of knowingly helping to facilitate non-obligatory and unjustified payments (*i.e.*, kickbacks) from the contractor to third-party beneficiaries with which government officials were engaged on separate, unrelated business.

## A.      Summary of the Illicit Contract

In early 2014, the South African province of Gauteng ("Gauteng") awarded contracts to eight companies for a large-scale asbestos eradication project.  Gauteng awarded one of the contracts to Blackhead Consulting (PTY) LTD ("Blackhead").  The Gauteng contract with Blackhead was set to expire in or around April 2014.  An audit was performed later in 2014 and 2015 and determined that Gauteng's contract with Blackhead was irregular.

On May 28, 2014, after the Gauteng contract had expired, a joint venture between Blackhead and Diamond Hill Trading 71 Consulting ("Diamond Hill," collectively the "joint venture" or "JV") submitted an unsolicited bid to the neighboring province of Free State to perform the same type of asbestos eradication as Blackhead had contracted in Gauteng.  Records

indicated that the JV was formed no earlier than the date on which the asbestos eradication proposal was submitted to Free State.

Free State had not called for proposals or otherwise announced an asbestos eradication project in Free State at the time it received the proposal from the JV. Pursuant to South African law, unsolicited contract bids received outside of a competitive process are generally impermissible but may be awarded under specified, limited circumstances. In particular, South African Treasury Regulation 16A6.6 permits government entities to "piggyback" off of a contract awarded by means of a competitive bidding process conducted by another government entity if certain conditions are met. Such conditions include: the underlying contract must be unexpired, the contract cannot be extended beyond the duration established by the initial entity, and the goods or services provided to the second entity must be identical to those provided to the first entity.

On June 26, 2014, one month after receiving the JV's unsolicited bid, Elias Magashule ("Magashule"), Premier of Free State province and member of the African National Congress political party ("ANC"), delivered a State of the Province speech in which he stated that an asbestos eradication project would take place within Free State between 2014 and 2019. At the time of this speech, Cholota was serving as Magashule's personal assistant, and it is alleged she would have known about this announcement due to her position within the administration.

On October 1, 2014, the Free State Department of Human Settlement ("FSDHS"), which was authorized to award contracts on behalf of Free State, formally awarded a contract in the amount of 255 million South African rand (approximately $22,602,224 USD) to the JV for the purpose of asbestos eradication within Free State. FSDHS awarded the contract to the JV

3

without a competitive bidding process and instead based its award on Blackhead's contract with Gauteng province.  The contract between FSDHS and the JV was later found to be irregular.

In February 2015, the JV issued a report to FSDHS purporting to provide an assessment of the scope of the asbestos eradication project.  South African prosecutors allege that the report was suspicious because it was issued too quickly for the amount of work required and contained inaccurate data regarding the location of asbestos-laden buildings, including duplicate addresses within the report, addresses for homes that did not actually exist, and addresses for homes that could not have contained asbestos.

Additionally, according to the extradition request, Ignatius Mpambani ("Mpambani") and Pheagane Edwin Sodi, Directors of Diamond Hill and Blackhead respectively, exchanged emails in March 2015, discussing the "cost of business" schedule for the JV.  The schedule recorded alleged bribes to five government officials, including Premier Magashule, in the total amount of 27 million rand.

The South African Auditor General issued a report on July 31, 2015, finding that the asbestos contract between FSDHS and the JV was irregularly procured.[1]  Around the same time, the Democratic Alliance, a political party in opposition to the ANC, filed a complaint with the Free State High Court regarding the illicit contract.  According to South African prosecutors, Cholota knew or should have known about the Auditor General's report and the Democratic Alliance's complaint.

Through eight separate invoices, FSDHS paid a total of 230 million rand (approximately $20,386,320 USD) to the JV between December 2014 and August 2016 in furtherance of the

---

[1] The Auditor General's findings were corroborated by a report by the public prosecutor issued on March 20, 2020.

contract.  Notably, upwards of 139 million rand (approximately $10-11 million USD) were made to the JV after the Auditor General's report concluded that the contract was unlawful.  In exchange, the Premier's Office, through Cholota, solicited payments from Mpambani to be paid to third parties designated by Magashule.  According to South Africa's investigation, Mpambani, at the direction of the Premier's Office, provided 1,371,310.98 rand (approximately $121,547.76 USD) in payments to third parties who were engaged in other business with the Premier's Office but had no apparent relation to the JV.

South African authorities later hired a private forensic firm, FTI Consulting ("FTI"), to conduct an objective forensic audit of all evidence related to the asbestos eradication contract. FTI issued a report in 2023 confirming that neither the JV nor its subcontractors ever performed any asbestos eradication work in Free State.  It also confirmed the numerous payments between FSDSH and the JV under the illicit contract, as well as the unlawful payments from Mpambani to third parties designed by Magashule.

**B.    Cholota's Alleged Conduct in Furtherance of the Criminal Scheme**

South African prosecutors allege that Cholota assisted Magashule in securing kickback payments from Mpambani in exchange for awarding the asbestos contract.  Significantly, Cholota sought these payments from Mpambani within mere days or weeks of payments from the FSDHS to the JV in connection with the awarded contract.  The four fraud charges for which Cholota's extradition is sought are based on four specific payments from the FSDHS to the JV in furtherance of the illicit contract; those payments were issued on March 26, 2015, June 4, 2015, August 11, 2015, and January 28, 2016, immediately before Cholota solicited payments from Mpambani in return.

The five corruption charges for which Cholota's extradition is sought are based on five separate payments from Mpambani to third parties made at Cholota's direction.  On each of these occasions, Cholota communicated directly with Mpambani to request payment to a third-party beneficiary designated by Magashule.  These third parties included two companies supplying hundreds of electronic tablets for unspecified use, a contact in Cuba seeking to purchase electronic tablets for apparent educational purposes, one of Magashule's childhood acquaintances who requested assistance in paying her daughter's college tuition fees, and a travel agency that booked travel accommodations for an ANC delegation's trip to Cuba.  A description of the relevant financial transactions, and Cholota's corresponding conduct, are described below.

### A.  Transaction Related to March 26, 2015, Contract Payment

The forensic audit demonstrated that FSDHS provided payment in the amount of 25 million rand to the JV in furtherance of the illicit contract on March 26, 2015.  On May 6, 2015, Cholota emailed Mpambani requesting payment of 30,000 rand to "the SRC President in Cuba" and provided the bank account information for S.W.C. Nkate.  On May 9, 2015, Mpambani, using his personal bank account, paid 30,000 rand with a transaction reference listing the payment as a "Cuban School Donation."

### B.  Transaction Related to June 4, 2015, Contract Payment

In the same May 6, 2015, email to Mpambani, Cholota attached an invoice in the amount of 470,000 rand directed to the Office of the Premier from a company called M-Tag, seeking payment for 200 "M-Tag I700" tablet devices.[2]  M-Tag purportedly provided curriculum aligned educational content in the form of videos, worksheets and self-assessments.  On June 4, 2015,

---

[2] M-Tag was registered on December 7, 2016, only after an invoice was sent to the Office of the Premier.

FSDHS paid the JV 15 million rand in furtherance of the illicit contract.  The very next day, on June 5, 2015, Cholota emailed Mpambani requesting payment on the 470,000 rand M-Tag invoice.  Blackhead paid 500,000 rand on June 11, 2015, towards a "Cuba trip."

      C.   <u>Transactions Related to August 11, 2015, Contract Payment</u>

Magashule was a former classmate of former Free State Acting Judge Refiloe Mokoena ("Mokoena").  Beginning in July 2014 and continuing until at least August 2015, Mokoena exchanged emails with Magashule's office seeking payment of her daughter's tuition fees. During the relevant time, Mokoena's daughter was a student at the University of the Free State and was offered a fifty-percent scholarship to study in the United States at Lycoming College in Pennsylvania.  Mokoena met with Magashule in Germany on July 12, 2015, while serving as part of a delegation accompanying the Premier.  During that meeting, Magashule told Mokoena that the Office of the Premier was able to financially assist deserving students and invited her to make a request of his office.

Mokoena sent an email on July 17, 2015, to an account to which both Magashule and Cholota had access, forwarding on documents "for purposes of settling my daughter's university account."  Thereafter, on July 27, 2015, Cholota sent an email to the Deputy Director of Protocol Services within the Department of the Premier, stating that Magashule and Mokoena had reached an agreement to pay Mokoena's daughter's tuition and requesting that such payment be disbursed by July 31, 2015.  Cholota then reached out to several entities soliciting reimbursement for Mokoena's daughter's school fees.[3]

---

[3] One company that Cholota solicited on August 8, 2015, paid part of the school fees on August 14, 2015, and April 12, 2016.

On August 11, 2015, the FSDHS paid the JV 36.5 million rand in furtherance of the illicit contract.  The following day, on August 12, 2015, Cholota forwarded to Mpambani Mokoena's July 17, 2015, email regarding her daughter's school fees.  On or about August 15, 2015, Cholota assisted Magashule in facilitating the transfer of 53,550 rand (approximately $4,183), from Mpambani to Mokoena.  Mpambani provided payment through a Diamond Hill account, and he provided proof of payment to Cholota on August 17, 2015.  Cholota confirmed proof of the payment to Magashule on August 18, 2015, and forwarded the proof of payment to Mokoena the same day.  In an interview with auditors, Mokoena confirmed that she did not know Mpambani and had been unaware of the source of the payment for her daughter's tuition.

In separate transactions only a few weeks after FSDHS's payment of 36.5 million rand, Mpambani, through a subcontractor and Diamond Hill respectively, paid a total of 300,000 rand to a company called Griffin Edge (Pty) Ltd ("Griffin Edge") at Cholota's direction on August 31, 2015, and September 1, 2015.  The payments to Griffin Edge were purportedly for the purchase of 200 electronic tablets.  For the August 31, 2015, transaction, Mpambani sent money from the account of the entity 605 Consulting, for which he was the only authorized signatory, with the transaction description of "OFFICE TABLETS" and "2015/8/A14-000016."  For the September 1, 2015, transaction, Mpambani sent money from the Diamond Hill account to Griffin Edge, with the transaction description of "Vodacom Tablets 2015/8/A14/000016."  Mpambani then emailed confirmation of the 100,000 rand payment on September 1, 2015, to the Office of the Premier, and Cholota confirmed that the proof of payment was received.  As part of its audit, FTI was unable to find any legitimate reason why Mpambani made these payments to Griffin Edge or why these payments to Griffin Edge were processed through Magashule's office.

D.  Transaction Related to January 28, 2016, Contract Payment

Beginning in August 2015, Cholota exchanged emails regarding upcoming meetings to determine who would be part of a government delegation on a trip to Cuba.  It was later determined that the delegation would be comprised of members of the ANC, and Cholota coordinated with a travel agency, Astra Travel ("Astra") to book the accommodations for the delegation.  Cholota also exchanged emails with Astra to determine how payment would be made in connection with this trip.  On November 12, 2015, the ANC paid 500,000 rand in connection with these travel arrangements, and the ANC provided proof of payment to Astra and Cholota.

On November 16, 2015, Astra forwarded the invoices to Magashule's office, and Astra forwarded the same invoices to Cholota directly the following day.  Astra followed-up with Cholota on December 1, 2015, proposing an amount of the final balance.  Cholota responded the same day acknowledging receipt of the invoices, confirming that Astra could proceed with payment of its vendors, and stating that she would talk to Magashule about payment of the remaining balance.  The following day, on December 2, 2015, Astra forwarded the final invoice reflecting a balance of 485,000 rand to Cholota and another individual in Magashule's office and requested that payment be provided by December 7, 2015.

On January 28, 2016, the FSDHS processed a payment to Blackhead for 10 million rand in connection with the asbestos contract.  That same day, Cholota emailed Astra's banking details to Mpambani requesting 250,000 rand "as discussed telephonically," and asking him to send proof of payment directly to her email address.  The next day, on January 29, 2016, Astra sent a proposed invoice to Cholota in the amount of 250,000 rand and asked if the invoice was

"OK." Cholota responded that "it's perfect." Cholota then immediately forwarded the invoice to Mpambani, and Mpambani confirmed receipt. Mpambani sent a payment of 250,000 rand from an account belonging to 605 Consulting to Astra on January 30, 2016, with the transaction references listed as "TRAVEL-CUBA 2015" and "CUBA DELEGATION." Two days later, Cholota confirmed the payment was received.

Then, on March 18, 2016, Cholota emailed the former branch manager of the ANC, with an attached Astra invoice, stating that Magashule had requested that ANC pay the remaining balance because she had been unable to find a sponsor to cover the balance.

## C.     Additional Evidence of Cholota's Knowledge of and Participation in the Criminal Scheme

The extradition request contains numerous other pieces of evidence that support the South African authorities' allegations that Cholota knew about and participated in from the illicit contract and kickback scheme.

*First*, the request reflects that shortly after the FSDHS's payment to the JV on March 26, 2015, Mpambani paid 237,710.98 rand towards tuition fees of students listed in a spreadsheet that had been forwarded from the receptionist in the Free State Department of the Premier to Cholota on April 10, 2015. The spreadsheet contained a list of nine students, listed by student number, and the amounts of their outstanding tuition fees. On April 11, 2015, Mpambani made eight separate transactions to three separate universities in amounts that exactly matched the tuition fees owed by eight of the students listed in the spreadsheet. Notably, the reference line for each transaction contained the corresponding student number for the exact amount owed.

*Second*, Cholota personally sent emails confirming Mpambani's attendance at several high-profile events put on by Magashule's office. For one event in July 2016, Cholota's email

10

confirms that Mpambani was seated at Magashule's table at an event, signaling that Mpambani was "far more important than the average businessman." Additionally, Mpambani was invited to the State of the Province address given by Magashule in 2017. The request also references two additional events that Mpambani attended in November and December 2015, respectively.

*Third*, Cholota possessed two bank accounts, one for her personal transactions, including her receipt of her paychecks for her employment at the Premier's Office, and another account that was undisclosed to authorities and received unknown cash deposits as well as transfers from service providers, individuals related to service providers, ANC members, individuals with a close relationship with Magashule, and other government officials mainly within the Office of the Premier.

*Fourth,* Cholota's cousin, as well as Magashule's son, were two of only a handful of beneficiaries of scholarships awarded in January 2018, by the Free State Provincial Government to students seeking to study at Bay Atlantic University ("BAU") in Washington, D.C.

*Fifth*, Cholota was later awarded a grant from the Free State Provincial Government to study in the United States at BAU. According to South African authorities, Cholota failed to meet several of the designated criteria to be eligible for educational funds through Free State. Notably, Magashule served on the Board of Trustees for BAU when Cholota was accepted to the school in July 2019. The record further reflects that Cholota was personally invited by the university to tour the campus.

D.      **Summary of South Africa's Investigation of Cholota**

The extradition request contains an affidavit from an investigator from the Judicial Commission of Inquiry Allegations of State Capture, indicating that her unit was asked to

investigate the asbestos contract in Free State, specifically the allegation that Magashule's office had requested vendors to pay certain expenses requested by the Premier.  The affidavit indicates that a whistleblower had provided relevant emails between Cholota and Mpambani, which then led to the investigator seeking interviews with Cholota in connection with the investigation.

The investigator met with Cholota on June 18, 2019.  According to the investigator, Cholota was generally cooperative during that meeting and had given consent to search her electronic devices.  The investigator attempted to conduct a follow-up interview with Cholota by phone on July 17, 2019.  The investigator stated that, "Cholota's attitude started to change, and she was no longer as cooperative as during the first interview."  Notably, this appears to coincide with when she was accepted into the BAU program.  Regarding an additional interview on August 5, 2019, the investigator stated that Cholota was again reluctant to cooperate. Cholota eventually testified before the Judicial Commission on December 6, 2019.

In connection with a mutual legal assistance request South Africa sent to the United States pursuant to the countries' bilateral treaty, Cholota was interviewed in Baltimore, Maryland, on September 22-23, 2021.  During the first interview on September 22, 2021, Cholota was asked questions about the Premier Office's payments of student fees, electronic tablets, and travel expenses, but she refused to provide answers.  She specifically stated that she was uncomfortable answering questions about who ordered her to seek payments on behalf of the Premier's Office.  She eventually said that the requests were made by the "office of the Premier," but she declined to identify any particular individual.  At the second part of her interview on September 23, 2021, Cholota was informed that she was no longer considered a prosecution witness but instead was considered a suspect who had a right to remain silent and obtain counsel.

Cholota requested a legal representative and confirmed that she was willing to provide a written statement, through counsel, in response to the prosecutors' questions by October 23, 2021.[4]

In connection with the ongoing criminal proceedings against Cholota and her co-defendants in South Africa, Cholota's South African counsel told the court on January 20, 2023, that she was prepared to travel to South Africa and surrender herself.  Cholota has yet to do so.

Accordingly, South Africa has sought Cholota's extradition pursuant to its extradition treaty with the United States.[5]  The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Cholota's arrest.  This Court issued the arrest warrant, and Cholota was arrested on April 12, 2024.  Cholota is currently in the custody of the U.S. Marshals Service.

## II.  APPLICABLE LAW

### A.   Legal Framework of Extradition Hearing Proceedings

The extradition process is *sui generis*, neither a criminal nor a civil proceeding.  The framework applicable to United States' extradition proceedings is described below, along with the Court's circumscribed role in the extradition process.

---

[4] The extradition request does not reflect whether such statement was ever provided.

[5] Extradition Treaty Between the Government of the United States of America and the Government of the Republic of South Africa, U.S.-S. Afr., Sept. 16, 1999, S. TREATY DOC. NO. 106-24 (2000) (referenced hereafter as the "Treaty").

1.      **The role of the Court in Extradition Proceedings**

Extradition is primarily an executive branch function; however, federal law provides for a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see also Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014) ("The process of extraditing a non-United States citizen to a foreign nation is conducted largely by the United States Department of State . . . .").

At the extradition hearing, the Court's role is to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification are satisfied. *Ordinola v. Hackman*, 478 F.3d 588, 597 (4th Cir. 2007); *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000). If the Court finds that the requirements for certification have been met, the Court must furnish a certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender to the requesting country. 18 U.S.C. § 3184; *Ordinola*, 478 F.3d at 609; *Cheung*, 213 F.3d at 88. The Secretary of State, and not the Court, makes the final decision regarding whether the fugitive should ultimately be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Plaster v. United States*, 720 F.2d 340, 354 (4th Cir. 1983) ("Within the parameters established by the Constitution, the ultimate decision to extradite is, as has frequently been noted, reserved to the Executive as among its powers to conduct foreign affairs."). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet

14

simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

> **2.      The Requirements for Certification Under Section 3184**

At the extradition hearing, the Court's review is limited to determining whether: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *See Mironescu v. Costner*, 480 F.3d 664, 665 (4th Cir. 2007); *Peroff v. Hylton*, 542 F.2d 1247, 1249 (4th Cir. 1977); *In re Extradition of Etouman*, 533 F. Supp. 3d 312, 316 (E.D. Va. 2021). The following sections briefly discuss each finding the Court must make in order to issue the certification to the Secretary of State.

> **i.      Authority of the Court over the Proceedings**

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States," but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999); *In re Extradition of Nezirovic*, No. CIV.A. 7:12-

MC-39, 2013 WL 5202420, at *3 (W.D. Va. Sept. 16, 2013).  Here, D. Md. Local Rule 301(6)(v)

expressly permits magistrate judges to conduct extradition proceedings.

ii.    <u>Jurisdiction over the Fugitive</u>

The Court has jurisdiction over a fugitive found within its jurisdictional boundaries.

18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found

within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."); *Ye*

*Gon*, 774 F.3d at 214.  Here, Cholota had a listed address and was found at said address in the

Northern Division of the United States District Court for the District of Maryland.

iii.    <u>Treaty in Full Force and Effect</u>

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a

treaty or convention is in force between the requesting state and the United States.  *See Etouman*,

533 F. Supp. 3d at 316; *Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 644 (W.D. Va. 2014).

The government will satisfy this requirement at the extradition hearing by offering into evidence

a declaration from an attorney in the Office of the Legal Adviser for the Department of State,

attesting that there is a treaty in full force and effect between the United States and the requesting

country.  The Court should defer to the Department of State's determination in that regard.

*United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997) ("Whether a treaty

remains in force after a change in the sovereign status of one of the signatories has been treated

by other Courts of Appeals as a political question better left to the executive branch of

government.") (citing *Terlinden v. Ames*, 184 U.S. 270, 285 (1902)); *Sumitomo Shoji Am., Inc. v.*

*Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to

treaty provisions by the Government agencies charged with their negotiation and enforcement is

16

entitled to great weight."). Here, the government attached to its complaint a declaration from an official with the U.S. Department of State indicating that there is a treaty in full force and effect between South Africa and the United States. *See* ECF 1 at Exhibit 1. And a copy of the treaty was attached to the declaration. *Id.*

iv.   <u>Crimes Covered by the Treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the U.S.-South Africa Treaty provides for the return of fugitives who have been charged with or convicted of an extraditable offense. Article 2 of the Treaty defines offenses as extraditable if "it is punishable under the laws in both States by deprivation of liberty for a period of at least one year or by a more severe penalty."

Consequently, in assessing whether the crimes for which extradition is requested are covered by the Treaty, the court will examine the description of criminal conduct provided by South Africa in support of its charges and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 61 (1903); *Zhenli Ye Gon*, 774 F.3d at 210; *Hu Yau-Leung v. Soscia*, 649 F.2d 917, 918 & n.4 (2d Cir. 1981). A requesting country need not establish that its crimes are identical to ours. *Zhenli Ye Gon*, 774 F.3d at 217 (noting that "dual criminality requires only that the offenses in the two countries punish the same basic evil; it does not require that the offenses contain identical elements"). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It

17

is enough if the particular act charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259
U.S. 309, 312 (1922).

Moreover, in fulfilling its function under Section 3184, the judicial officer should
liberally construe the applicable extradition treaty in order to effectuate its purpose, namely the
surrender of fugitives to the requesting country.  *Factor v. Laubenheimer*, 290 U.S. 276, 296
(1933).  Accordingly, because extradition treaties should be "interpreted with a view to fulfil our
just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should
"approach challenges to extradition with a view toward finding the offense within the treaty,"
*McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828
F.3d 451, 463 (6th Cir. 2016) ("The point of an extradition treaty after all is to facilitate
extradition . . . .").

v. <u>Probable Cause that the Fugitive Has Committed the Offense</u>

To certify the evidence to the Secretary of State, the Court must conclude there is
probable cause to believe that the crimes charged by South Africa were committed by the person
before the Court.   "[T]he probable cause standard applicable to an extradition hearing is the
same as the standard used in federal preliminary hearings, meaning that the magistrate judge's
role is merely to determine whether there is competent evidence to justify holding the accused to
await trial."  *Ordinola*, 478 F.3d at 608 (internal quotation marks and citation omitted); *see also
Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined
in terms of facts and circumstances sufficient to warrant a prudent man in believing that the
(suspect) had committed or was committing an offense.") (internal quotation marks and citation
omitted).

In this way, the extradition hearing is "not designed as a full trial" but as a means of "inquir[ing] into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country." *Peroff*, 542 F.2d at 1249. The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (internal quotations and citation omitted).

In making a probable cause determination, "the evidence considered by the magistrate as part of an extradition hearing 'need not meet the standards for admissibility at trial' and 'may be based upon hearsay in whole or in part.'" *Ordinola*, 478 F.3d at 608. "Unsworn statements can be sufficient to support a probable cause determination." *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008). Neither the Federal Rules of Criminal Procedure, nor Federal Rules of Evidence apply to extradition proceedings.[6] *See Haxhiai,* 528 F.3d at 292. Moreover, the fugitive has no general right to discovery in an extradition proceeding. *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976). The fugitive's right to present evidence is severely constrained, *Shapiro v. Ferrandina*, 478 F.2d 894, 900-01 (2d Cir. 1973); and her constitutional rights are limited, *see Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. 2005) ("[extradition] proceedings are not designed to determine the guilt or innocence of the accused, and therefore, certain due process protections are simply not

---

[6] Fed. R. Crim. P. 1(a)(5)(A) states: "Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive." Fed. R. Evid. 1101(d)(3) provides: "These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."

applicable."). For example, the fugitive has no right to cross-examine witnesses, *Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011); there is no Sixth Amendment right to a speedy trial, *Jhirad*, 536 F.2d at 485 n.9; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (citing *Collins*, 262 U.S. at 429); the exclusionary rule does not apply, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and the fugitive does not have the right to confront her accusers, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

These rules are all in place because "extradition proceedings are not to be converted into a dress rehearsal trial" for the trial that will take in the requesting country; rather, such searching trials must take place in the requesting country in the first instance. *Jhirad*, 536 F.2d at 484 (citing *Charlton v. Kelly*, 229 U.S. 447, 460 (1913)).

## B.    Legal Framework Of Requests For Bail Pending Extradition Hearing

Just as extradition proceedings follow unique procedures, the determination of whether to release on bail a fugitive subject to extradition proceedings is also *sui generis*. The federal statutes governing extradition, 18 U.S.C. §§ 3184 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[7] *See Collins*, 259 U.S. at 316; *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 597 (W.D. Va. 2013).

Rather, unlike in domestic criminal cases, there is a "powerful presumption against bail" in international extradition cases. *United States v. Zarate*, 492 F. Supp. 2d 514, 515 (D. Md.

---

[7] The Bail Reform Act applies only to "offenses" against the United States that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, the fugitive is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed against the requesting state, South Africa.

2007) (citing *Wright v. Henkel*, 190 U.S. 40, 62 (1903)); *see also In re Extradition of Russell,*

805 F.2d 1215, 1216 (5th Cir.1986) (holding that there is a presumption against bail in

extradition cases).  "[B]ail should be granted only in the most pressing circumstances, and when

the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159,

160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

 This presumption against bail is rooted in *Wright v. Henkel*, where the Supreme Court

explained that when a foreign government makes a proper request under a valid extradition

treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law
> require it to do, is entitled to the delivery of the accused on the issue of the proper
> warrant, and the other government is under obligation to make the surrender; an
> obligation which it might be impossible to fulfill if release on bail were permitted.
> The enforcement of the bond, if forfeited, would hardly meet the international
> demand; and the regaining of the custody of the accused obviously would be
> surrounded with serious embarrassment.

190 U.S. at 62.

 The prudential reasons for this presumption against bail in international extradition cases

are clear and compelling.  When, as here, the Government of South Africa meets the conditions

of the Treaty, the United States is obliged to deliver the fugitive.  It is important that the United

States be regarded in the international community as a country that honors its agreements in

order to be in a position to demand that other nations meet their reciprocal obligations to the

United States.  Such reciprocity would be defeated if a fugitive flees after being released on

bond.  *See id.*; *see also Leitner*, 784 F.2d at 160-61 (the Government has an overriding foreign

relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave South Africa without either remedy or compensation.

1.     **Fugitives Must Be Detained Unless They Are Neither a Flight Risk nor a Danger to the Community and Establish "Special Circumstances"**

Given the strong presumption against bail established in *Wright*, a fugitive may not be released on bail unless she demonstrates that: (1) she is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant her release.  *See, e.g.*, *Leitner*, 784 F.2d at 160; *Nezirovic*, 990 F. Supp. 2d at 599-600 ("Under the special circumstances standard, admission to bail should be an unusual and extraordinary thing, and courts should exercise the power sparingly.") (internal quotation marks and citations omitted).  "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act."  *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).  Moreover, the burden is on the fugitive to establish the existence of special circumstances by clear and convincing evidence. *Nezirovic*, 990 F. Supp. 2d at 599, n.1 (citing cases).

Significantly, a fugitive charged with crimes in another country is already by definition in flight or deliberately absent from that jurisdiction.  *See In re Extradition of Lagadec*, 386 F. Supp. 3d 629, 630 (E.D.N.C. 2019).  In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense.  *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the

"incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Additionally, a fugitive may be deemed a flight risk if they had an opportunity to return to their home country to face charges, but did not voluntarily return. *Beresford-Redman*, 753 F. Supp. 2d at 1091.

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *Leitner*, 784 F.2d at 161; *Nezirovic*, 990 F. Supp. 2d at 598; *see also Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 130 (E.D.N.Y. 2001) ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.

Where a fugitive claims "special circumstances," courts consistently agree that they must be "extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Lagadec*, 386 F. Supp. 3d at 629 (stating that special circumstances must be "'extraordinary and not factors applicable to all [fugitives] facing extradition'") (quoting *Nezirovic*, 990 F. Supp. 2d at 599); *see also, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 472 (S.D. Tex. 2010) ("special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees.").

Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271–72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney or participate in pending litigation, *see, e.g.*, *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992); *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1300, 1305 (S.D. Fla. July 7, 2017); *In re Extradition of Saldana*, No. 09-MJ-00014-P, 2009 WL 2134377, at *3 (W.D. Tenn. July 10, 2009) (stating that a fugitive's character and background "are typically not considered special circumstances on their own, but are more often considered in regard to risk of flight and danger to the community, rather than as a special circumstance") (internal quotation marks, citations, and alterations omitted);

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Nezirovic*, 990 F. Supp. 2d at 602; *Lagadec*, 386 F. Supp. 3d at 630; *In re Extradition of Rouvier*, 839 F. Supp. 537, 541–42 (N.D. Ill. 1993); *In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514, at *2 (S.D. Tex. June 23, 2008);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 17-cv-00861, 2017 WL 1197855, at *4 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *Borodin*, 136 F. Supp. 2d at 131; *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir.

24

1989); *In re Extradition of Nagy*, No. 1:17MJ3283, 2017 WL 6558487, at *4
(N.D. Ohio Dec. 21, 2017) (stating that fugitive "cannot complain of the passage
of time when he has been a part of the reason the time has passed"); *Antonowicz*,
2017 WL 1197855, at *3; *Nezirovic*, 900 F. Supp. 2d at 604 (normal passage of
time inherent in litigation not special circumstance); *Lagadec*, 386 F. Supp. 3d at
630 (rejecting claim concerning France's delay); and

- The availability of bail for the same offense in the requesting country, *see, e.g.*,
  *Antonowicz*, 2017 WL 1197855, at *3; *In re Extradition of Garcia*, 615 F. Supp.
  2d 162, 172 (S.D.N.Y. 2009); *In re Extradition of Siegmund*, 887 F. Supp. 1383,
  1386-87 (D. Nev. 1995).

While in certain exceptional cases, some of the above may have been deemed a special

circumstance, courts generally determine special circumstances to exist based on a confluence of

factors, as opposed to any single consideration. Such findings are highly case-specific and

within the discretion of the court, mindful of the strong presumption against bail and future

reciprocity of other countries at stake.

### III.  ARGUMENT

**A.      Cholota Should Be Detained Pending The Extradition Hearing**

The Court should detain Cholota without bond because she is a flight risk and has not and

cannot demonstrate any "special circumstances" that are individual to her that would overcome

the heavy presumption here in favor of detention pending international extradition to South

Africa.

First, Cholota's request for bail fails because she is a flight risk. As an initial matter, the

fact that she is a fugitive charged with crimes in another country from which she is deliberately

and knowingly absent makes her by definition a flight risk. *See In re Extradition of Lagadec*,

386 F. Supp. 3d at 630. And if that were not enough, Cholota's specific conduct here only re-

enforces that she must be considered a flight risk. Specifically, as detailed above, Cholota was

first made aware of the investigation in 2019, but she did not return to her home country then. She was then told she was a target of the investigation in 2021, but she did not return to her home country then either. Moreover, in 2023, her South African counsel indicated to the courts there that she would return to her home country to face the charges, but she has yet to do so. The fact Cholota has refused to return to South Africa after learning that she was a suspect on criminal charges in South Africa is highly indicative of her risk of flight were she to be released on bond here. *See In re Extradition of Beresford-Redman*, 753 F. Supp. 2d at 1091; *see also United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483).

Additionally, the seriousness of the charges and the prospect of serving a lengthy prison sentence in South Africa provides Cholota with a significant incentive to flee. *see also*, *e.g.*, *Shaw*, 2015 WL 521183, at *9 ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Indeed, Cholota is charged with official corruption. These are serious charges that carry important ramifications.

Additionally, the evidence proffered from South Africa demonstrates Cholota maintained separate bank accounts, one for her official checks and one into which unknown sources of funds flowed freely. This potential access to cash and multiple accounts should demonstrate further she is a potential flight risk. *See Beresford-Redman*, 753 F. Supp. 2d at 1091.

Furthermore, the nature of these proceedings, the low bar required for extradition, and the strength of the South African government's proof demonstrate why Cholota should be considered a flight risk.  As detailed above, there is a presumption in favor of extradition.  The process afforded to Cholota is much less than what would be afforded to a typical criminal defendant.  Considering the low bar for extradition, and the strength of the government's evidentiary proffer, this also confirms Cholota is a flight risk.  *In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico").

Accordingly, allowance of bail in any amount would not guarantee Cholota's presence in Court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Second, even assuming Cholota is not a flight risk, her claim for bail would still fail because the Government is unaware of any "special circumstances" that would justify bail in this case.  Indeed, as detailed above, courts have rejected numerous claims of "special circumstances."  There is simply no basis to believe that Cholota could clear the very high bar here to demonstrate any special circumstances by clear and convincing evidence.  Accordingly, this provides an additional reason why Cholota's request for bail must be denied.[8]

---

[8] Should the Court disagree and be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances" so that any such finding can be presented to the Government of South Africa.  Moreover, in order to protect the ability of the United States to meet its treaty obligations to South Africa, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## IV.   CONCLUSION

For the foregoing reasons, the United States requests that Cholota be detained pending resolution of the extradition proceedings.

Respectfully submitted,

EREK L. BARRON
United States Attorney

By:         _____/s/_____

Jason D. Medinger
Assistant United States Attorney

## **CERTIFCATE OF SERVICE**

I hereby certify that the foregoing was filed via CM/ECF and that in doing so a copy was served on counsel for the fugitive through the CM/ECF system.

EREK L. BARRON
United States Attorney

By:         _____/s/_____

Jason D. Medinger
Assistant United States Attorney